**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JENNIFER L. COLUSSY,             )
                Plaintiff,     )
                     )
           vs.          )    Civil Action No. 13-1269
                     )    Judge Nora Barry Fischer
CAROLYN W. COLVIN, *Acting*    )
*Commissioner of Social Security*,    )
                     )
          Defendant.    )
                     )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Jennifer L. Colussy ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the final determination of the Commissioner of Social Security ("Defendant") or ("Commissioner") denying her application of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act 42 U.S.C. §§ 401-433, 1381–1383(f) ("Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. [12], [16]). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment [12] is granted, in part, and Defendant's Motion for Summary Judgment [16] is denied.

## II.    PROCEDURAL HISTORY

Plaintiff previously applied for DIB and SSI on August 31, 2005. (R. at 13). That application was denied in a decision issued by Administrative Law Judge (ALJ) Malvin Eisenberg on October 23, 2006. (*Id.*). Then, Plaintiff reapplied for DIB and SSI February 8,

2010, alleging a disability onset of December 31, 2004. (*Id.*). She claimed disability due to seizures, hepatitis C, right shoulder problems, memory loss and thought processing problems. (R. at 206). Both the claims were initially denied on July 20, 2010, and Plaintiff filed a written request for a hearing on September 9, 2010. (R. at 81–104, 105–06). A hearing was subsequently held on December 22, 2011. (R. at 13). Plaintiff appeared with her mother, Sandra Taylor, and her attorney, Suzanna J. Hayden. (R. at 29–74). Vocational expert Samuel E. Edelmann was also present and testified. (*Id.*).

During the course of this hearing, Plaintiff amended her alleged disability onset date to October 24, 2007 due to her prior application being denied on October 23, 2007. (R. at 32–33). In a decision dated February 22, 2012, ALJ Michael F. Colligan considered Plaintiff's age, education, work experience, and residual functional capacity ("RFC") to determine that Plaintiff is "not disabled" under the Act. (R. at 24). Plaintiff requested a Review of Hearing Decision before the SSA Appeals Council. (R. at 8–9). This request was also denied, making the ALJ's decision the final decision of the Commissioner. (R. at 1–7).

Plaintiff subsequently filed a Complaint with this Court on September 9, 2013, (Docket No. [3]), followed by a Motion for Summary Judgment and Supporting Brief on January 13, 2014. (Docket Nos. [12], [13]). The Commissioner timely answered with a Cross-Motion for Summary Judgment and Brief on February 28, 2014. (Docket Nos. [16], [17]). Accordingly, the matter has been fully briefed and is ready for disposition.

III.    STATEMENT OF FACTS

A.    General Background

Plaintiff was born on July 8, 1967 and was forty-four (44) years old at the time of her administrative hearing. (R. at 35). Plaintiff is divorced and not currently married. (R. at 36, 404).

She has twin sons, who were born in 1990 and currently live with their father. (R. at 304, 404). Plaintiff lives alone in a house that is owned by her parents. (R. at 36). She graduated from high school, but has not received any additional education. (*Id*.). Plaintiff has worked at her mother's business, Forklift Sales and Repair, since her alleged disability onset date of October 24, 2007. (R. at 37). She works just a couple hours per day, writing a few invoices and checks. (*Id*.).

### B. Medical History

#### 1. Seizure Disorder

Plaintiff reported having seizures since she was 13 years old. (R. at 38, 546). Barry R. Austin, D.O. is the Plaintiff's primary care physician. (R. at 319). Mark E. Hospodar, M.D., a neurologist, began treating Plaintiff's seizure disorder in October 2006 and saw her several times per year through 2011.[1] (R. at 319–22, 546). As part of this treatment, Dr. Hospodar regularly monitored Plaintiff's medications, including by checking her blood levels of Depakote[2] and Dilantin.[3] Plaintiff has reported forgetting to take her medications sometimes. (R. at 545–46). Dr. Hospodar has also made periodic adjustments to her prescriptions upon determining that the levels of her medicines were too low. (*Id*.). Generally, Dr. Hospodar has noted that Plaintiff's seizures often are triggered by lack of sleep, stress, and menstrual cycle. (*Id*.).

In September 2007, Plaintiff was seen in an emergency department following a seizure. (R. at 332). At the time of this seizure, she was in a gas station, climbing onto the back of a motorcycle. (*Id*.). Plaintiff did not remember the seizure, and her treatment notes indicate that the

---

[1] Plaintiff's mother testified that the Plaintiff has been seen by neurologists in the same practice as Dr. Hospodar prior to 2006. (R. at 57).

[2] Depakote, or valproic acid, is an anticonvulsant used to treat seizures. *Valproic Acid*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited March 21, 2014).

[3] Dilantin, or phenytoin, is an anticonvulsant used to treat seizures. Phenytoin works by decreasing abnormal electrical activity in the brain. *Phenytoin*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html (last visited March 21, 2014).

seizure lasted about three to five minutes, followed by a twenty-minute period of decreased responsiveness, which gradually resolved. (*Id.*). Plaintiff said that she had not taken her medications the day before because her ex-boyfriend had used a gun to prevent her from getting the medications. (*Id.*). She further stated that she drank approximately six beers the night before, "which is typical for her." (*Id.*). In addition, Plaintiff reported occasional smoking and substance abuse, including crack cocaine. (*Id.*). Aside from low levels of Depakote and Dilantin, Plaintiff's physical and neurologic exams were normal. (*Id.*). She was administered Depakote and Dilantin and discharged home. (*Id.*).

Plaintiff reported increased menstrual problems to Hospodar in December 2007 and July 2008. (R. at 539, 541). Other than heavy menstrual cycles, the Plaintiff's physical exams were normal, and Dr. Hospodar reported that she was doing well on 1000 milligrams of Depakote twice a day and 200 milligrams of Dilantin twice a day. (*Id.*). In August 2008, Plaintiff underwent a hysterectomy. (R. at 309, 316–18).

In February 2009, Plaintiff reported to Dr. Hospodar that she had not experienced a seizure since July 2008. (R. at 340). Dr. Hospodar noted that her physical exam normal and that she was in "no distress." (*Id.*). A few days after this visit, Plaintiff went to the emergency room after another domestic abuse situation with her boyfriend. (R. at 346–48). A laceration to the right parietal region of Plaintiff's skull required five staples, and Plaintiff also complained of back and foot contusions. (*Id.*). Plaintiff was discharged with pain medication. (*Id.*). Plaintiff saw Dr. Austin the following month to have her staples removed. (R. at 352). During this visit, she reported no further seizures. (*Id.*).

Over the course of the next year, Dr. Hospodar's records indicate that Plaintiff experienced no grand mal seizures. (R. at 355, 357, 368). In November 2009, for example, Dr.

Hospodar noted that Plaintiff had been seizure free. (R. at 355). Her mental and physical exams were normal, and she was maintained on her medications. (*Id.*). Similarly, Plaintiff reported no grand mal seizures again during her March 2, 2010 visit with Dr. Hospodar, but did report occasional "blank spell[s]." (R. at 357). Dr. Hospodar kept Plaintiff's medications at the same levels. (*Id.*). An EEG[4] of Plaintiff on March 14, 2010 was abnormal. (R. at 358). In May 2010, Dr. Hospodar found that Plaintiff was doing well other than reports of poor memory, and Plaintiff again reported no seizures since her last visit in March 2010. (R. at 368).

Dr. Hospodar saw Plaintiff on October 6, 2010, at which time Plaintiff complained of further "blackout spells" and feeling depressed. (R. at 456). He reviewed Plaintiff's EEG, noting that it showed sharp waves bilaterally. (*Id.*). Upon examination, he found Plaintiff to be "an anxious woman in no distress." (*Id.*). Her auditory comprehension was good and she was able to follow three-step commands. (*Id.*). Dr. Hospodar opined that her "blackout spells" episodes may be either stress related or complex partial seizures.[5] (*Id.*). Because Plaintiff had been on Dilantin for close to thirty years, Dr. Hospodar decided to taper her off the Dilantin and put her on Keppra.[6] (*Id.*).

---

[4] An electroencephalogram (EEG) is a procedure that uses electrodes attached to the scalp to detect electrical activity in the brain. Electrical impulses are recorded on an EEG. EEG is one of the main diagnostic tests for epilepsy. *EEG (electroencephalogram)*, MAYO CLINIC, *available at* http://www.mayoclinic.org/tests-procedures/eeg/basics/definition/prc-20014093 (last visited March 27, 2014).

[5] Partial seizures occur when there is electrical activity in a limited part of the brain. Partial seizures can be characterized as complex if they affect awareness or memory of events before, during, and immediately after the seizure, and affect behavior. Symptoms vary, but can include abnormal muscle contraction, staring spells, abnormal sensations, blackout spells, changes in vision or changes in mood. *Partial Seizure*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000697.htm (last visited March 28, 2014).

[6] Keppra (Levetiracetam) is used in combination with other medications to treat certain types of seizures. Levetiracetam is an anticonvulsant and works by decreasing abnormal excitement in the brain. *Levetiracetam*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699059.html (last visited March 28, 2014).

Plaintiff was admitted to Ohio Valley General Hospital on October 27, 2010 after being found unconscious on the ground of a Giant Eagle parking lot. (R. at 464–65). Plaintiff did not clearly wake up for two to three days, and her drug screen was positive for opiates. (*Id.*). An EEG and a CT of the Plaintiff's head were performed, and the results of both tests were unremarkable. (*Id.*). She was diagnosed with a possible seizure or overdose, and was administered Depakote, Dilantin, and Keppra. (R. at 471). During this hospitalization, the attending physician, Dr. Amita Mital, increased Plaintiff's Depakote dose to 500 milligrams twice daily, increased her Dilantin dose to 200 milligrams twice daily, and maintained her on 500 milligrams of Keppra, twice daily. (R. at 485, 487). Dr. Mital also started Plaintiff on Potassium Chloride. (R. at 487). On October 31, 2010, Plaintiff was discharge to home and instructed to follow up with Dr. Hospodar in two weeks. (R. at 465, 484).

Dr. Hospodar next saw Plaintiff on December 8, 2010. (R. at 454). He observed that she was "quite distraught" because of her medical condition and social stressors. (*Id.*). She stated that she did not stop taking the Dilantin because she was "feeling funny" when tapering off the medication. (*Id.*). Dr. Hospodar noted Plaintiff "has also had more grand mal seizures," although he commented that it was difficult to ascertain the total number and frequency of these seizures unless Plaintiff was hospitalized. (*Id.*). Additionally, Plaintiff reported a high level of stress because of problems with her boyfriend and with finances, and that her worries caused her to sleep poorly. (*Id.*). Dr. Hospodar ordered her medication levels to be checked, but otherwise prescribed Depakote ER 1000 milligrams twice daily, Dilantin 200 milligrams twice daily, and

Keppra 500 milligrams twice daily. (*Id.*). Finally, he indicated that Plaintiff should possibly be evaluated by the Allegheny General Epilepsy Clinic. (*Id.*).[7]

Dr. Hospodar saw Plaintiff on October 5, 2011, at which time he reported that Plaintiff exhibited poor memory, limited judgment and cognitive ability, and weakness in her right shoulder. (R. at 451). He observed that Plaintiff was experiencing "a little more grief," and has had more seizures, which he attributed to the decreased Depakote dose. (*Id.*). Dr. Hospodar therefore increased Plaintiff's Depakote to 1000 milligrams twice daily. (*Id.*).

On October 31, 2011, police found Plaintiff standing outside her car, incontinent with urine, after she lost control of her vehicle and drove into a ditch. (R. at 505). Plaintiff claimed she became lightheaded and confused, causing her to lose control of the car. (*Id.*). She stated that she remembered the accident. (*Id.*). Police knew her to be a frequent drug abuser, having taken care of her many times in the past. (*Id.*). Plaintiff was seen in the Emergency Department at St. Clair Hospital by Dr. Kevin Friend. (504–06). Her physical and neurological exams were normal. (R. at 506). Dr. Friend's differential diagnosis included possible relation to substance abuse, but determined that "it is most likely that she had a seizure." (*Id.*). He noted that Plaintiff was not able to provide a urine sample for a drug test. (R. at 507). Plaintiff's Depakote and Dilantin levels were low, and Dr. Friend "loaded" her with these medications, then discharged her to home. (R. at 507). He further notified the Department of Transportation, and Plaintiff's driver's license was suspended. (R. at 507, 286).

On February 28, 2012, Dr. Hospodar completed a "Health-Sustaining Medication Assessment Form" for the Pennsylvania Department of Public Welfare. (R. at 560–61). On this form, he indicated that Plaintiff was currently prescribed Keppra 1000 milligrams twice daily,

---

[7] The record contains no evidence of Plaintiff being seen by this Clinic.

Dilantin 200 milligrams twice daily, and Depakote ER 600 milligrams twice daily. (R. at 560). He further noted that, based on physical examination, review of Plaintiff's medical records, her clinical history, and appropriate tests and diagnostic procedures, that Plaintiff was temporarily disabled, beginning on January 1, 2012, and that he expected this disability to last until January 1, 2013. (R. at 561).

The most recent evidence contained in the record regarding Plaintiff's seizure disorder is a handwritten note. (R. at 562). This note is not signed, but is written on George Taylor Fork Lift Repair letterhead. (*Id.*). However, the Medical Records Index indicates that this note was supplied by Plaintiff as part of Dr. Hospodar's medical evidence. (Docket No. 8-1). The letter is titled "Seizure Schedule," and indicates that Plaintiff experienced blank spots on March 19, a grand mal seizure on March 30, and three grand mal seizures on June 4. (R. at 562). The letter further states that Plaintiff's medication was increased in March 2012. (*Id.*).

### 2.  Right Shoulder Impairment

Plaintiff frequently complained of tenderness and pain in her right shoulder. (R. at 357). On March 30, 2010, a MRI of the Plaintiff's right shoulder revealed severe degenerative joint disease. (R. at 358–62). Plaintiff saw Mark J. Langhans, M.D. for an orthopedic evaluation on April 22, 2010, and Dr. Langhans administered a DepoMedrol (anti-inflammatory) injection in Plaintiff's right shoulder. (R. at 388–89). Although Plaintiff said that physical therapy had not helped her in the past, Dr. Langhans recommended another course of physical therapy and a follow-up visit in six weeks. (*Id.*).

Plaintiff underwent physical therapy with Timothy Skraitz, D.C. from April 2010 to June 2010. (R. at 429–50). In his June 23, 2010 assessment, Mr. Skraitz noted that Plaintiff had a

chronic and/or intractable pain. (R. at 436). He assessed her with moderate to severe right shoulder osteoarthritis,[8] and that she is deconditioned from chronic pain. (*Id.*).

### 3.    Hepatitis C

Plaintiff is positive for Hepatitis C. (R. at 352). In August 2007, she was seen by Dr. Hossam Kandil, MD of the University of Pittsburgh Medical Center for treatment. (R. at 297–301). He opined that she likely contracted Hepatitis C through IV drug use. (R. at 298).  Based on his examination, he ordered tests and indicated that treatment may be indicated. (R. at 298).

Dr. Austin's notes indicate that he has repeatedly referred Plaintiff for treatment regarding her Hepatitis C, but that she has refused such care. (R. at 352).

### C.    Functional Capacity Assessments

### 1.    June 3, 2010 Physical RFC by Dr. Sekas

Gail Sekas, M.D. conducted a Physical Residual Functional Capacity Assessment on June 3, 2010. (R. at 397–403). Regarding exertional limitations, Dr. Sekas assessed that: Plaintiff could occasionally lift up to twenty pounds; could frequently lift and/or carry ten pounds; could stand and/or walk about six hours in an eight-hour work day; and had unlimited ability to push and/or pull. (R. at 398). With respect to postural limitations: Plaintiff could never crawl, and could only occasionally: climb, balance, stoop, kneel, or crouch. (R. at 399). In terms of manipulative limitations, Plaintiff was limited with respect to reaching all directions, including overhead, but had no other limits. (*Id.*). Dr. Sekas found no visual or communicative limitations. (R. at 399–400). Finally, regarding environmental limitations, he assessed that Plaintiff should avoid concentrated exposure to: extreme cold, extreme heat, and vibration; should avoid even

---

[8] Osteoarthritis, which is also called degenerative joint disease) is a form of arthritis that causes pain, swelling, and reduced motion in joints. This condition breaks down the cartilage found in joints, and over time, can cause permanent damage in the joint. *Osteoarthritis*, MEDLINE PLUS, *available at* http://www.nlm.nih.gov/medlineplus/osteoarthritis.html (last visited May 1, 2014).

moderate exposure to hazards; but was unlimited in terms of wetness, humidity, noise, and fumes / odors / dusts / and gases. (R. at 400).

Dr. Sekas relied on Plaintiffs medical records in forming his opinion. (R. at 401). Based upon this review, Dr. Sekas found that Plaintiff's claims that her medical impairments significantly limit her activities of daily living were only partially credible, in that such statements were not consistent with the other evidence of record. (R. at 402). To this end, he noted that: Plaintiff cares of her daily needs, performs routine household activities, does laundry, goes shopping, and drives a car. (R. at 402–03). He further found that the evidence indicated that Plaintiff's medications "have been relatively effective in controlling her symptoms" of seizure disorder, and that she had not had a seizure during the last year. (*Id.*).

### 2. July 1, 2010 Psychological Evaluation by Dr. Newman

On July 1, 2010, T. David Newman, Ph.D. conducted a Clinical Psychological Disability Evaluation of Plaintiff. (R. at 404). After interviewing Plaintiff and reviewing her medical records, Dr. Newman diagnosed Plaintiff with a pain disorder. (R. at 406). He noted that she has never been psychiatrically hospitalized or received outpatient mental health care. (R. at 404). His mental status exam found that Plaintiff had good hygiene and grooming, did not appear anxious, and described her mood as "crappy." (R. at 405). Dr. Newman opined that Plaintiff exhibited depressed affect, further commenting that her chronic pain and the fact that her dog died on the day of their interview likely contributed. (R. at 406). He "would anticipate her mood state is dependent upon the degree of physical discomfort she is coping with." (*Id.*). Dr. Newman also observed that Plaintiff was sedated, which might be a side effect of her medications. (*Id.*).

Overall, Dr. Newman assessed that Plaintiff has slight limitations with: understanding and remembering short, simple instructions. (*Id.*). She has moderate limitations with:

understanding and remembering detailed instructions; making judgments on simple work-related decisions; and interacting appropriately with co-workers. (*Id.*). She has marked limitations with: carrying out short, simple instructions; and responding appropriately to work pressures in a usual work setting. (R. at 406–07). Finally, she has extreme limitations with carrying out detailed instructions. (*Id.*). In Dr. Newman's opinion, Plaintiff is not capable of managing personal funds independently in a competent manner, and so he recommended that she be assigned a payee. (R. at 407).

        3.       July 14, 2010 Mental RFC and Psychiatric Review Technique by Dr. Heil

On July 14, 2010, Richard A. Heil, Ph.D. conducted a Mental Residual Functional Capacity Assessment. (R. at 410–13). He assessed that Plaintiff had moderate limitations with respect to: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining concentration and attention for sustained periods; performing activities within a schedule, maintaining regular attendance, and being punctual; and completed a normal workday and workweek without interruptions from psychologically based symptoms. (R. at 410–411). Otherwise, Dr. Heil found no limitations. (*Id.*).

In completing this form, Dr. Heil reviewed Dr. Newman's opinions in his report, and found some of his conclusions to be an overstatement of the severity of the claimant's functional restrictions. (R. at 412). More specifically, Dr. Heil noted that Dr. Newman "relied heavily" on Plaintiff's subjective reports of her symptoms and limitations. (*Id.*). Dr. Heil found Plaintiff to be only partially credible, given that the totality of the evidence does not support her subjective complaints. (*Id.*). Dr. Heil concluded that Plaintiff's memory functions were adequate to perform basic work related tasks, and that the she is able to meet the basic mental demands of competitive work despite the limitations from her impairments. (R. at 412–13).

Dr. Heil further completed a Psychiatric Review Technique on July 14, 2010. (R. at 414–27). He noted that Plaintiff has exhibited symptoms of a pain disorder and polysubstance abuse. (*Id.*). Based on these symptoms, he assessed that Plaintiff would have no limitation based on repeated episodes of decompensation. (R. at 424). However, these symptoms might cause mild limitations with respect to activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (*Id.*).

### 4.      October 5, 2011 Assessments by Dr. Hospodar

Dr. Hospodar has completed several assessments opining as to Plaintiff's disability claim. (R. at 453, 458–463). First, in an undated letter addressing "To Whom It May Concern," Dr. Hospodar wrote that Plaintiff is totally disabled from her medical condition. (R. at 453).

Next, he completed the medical assessment for Plaintiff's disability forms on October 5, 2011. (R. at 458–63). Dr. Hospodar opined that Plaintiff is not able to complete a sustained eight-hour workday. (R. at 458). She had no restrictions with lifting/carrying, standing/walking, or sitting. (458–59). Although she could never climb, Dr. Hospodar indicated that Plaintiff could occasionally balance, and could frequently kneel, crawl, bend, stoop, and crouch. (*Id.*). Dr. Hospodar noted difficulty with lifting heavy objects and weakness in her right arm. (R. at 460). In addition, Plaintiff has environmental restrictions around heights, machinery and chemicals due to grand mal seizures, which Dr. Hospodar estimated occur about once per month, with more frequent small seizures of which Plaintiff is unaware. (*Id.*).

Dr. Hospodar also completed a Mental Assessment of Plaintiff's ability to do work-related activities on October 5, 2011. (R. at 461–63). Therein, he opined that Plaintiff has poor or no ability to: use judgment; deal with work stresses; function independently; maintain attention / concentration; relate predictable in social situations; or demonstrate reliability. (R. at 461–62).

He assessed Plaintiff as having a fair ability to: understand, remember, and carry out job instructions, regardless of whether said job instructions are complex, detailed, or simple. (R. at 462). Plaintiff has a good ability to behave in an emotionally stable manner. (*Id.*). Finally, Dr. Hospodar indicated that Plaintiff has unlimited / vey good ability to: maintain personal appearance; follow work rules; relate to co-workers; deal with the public; and interact with supervisors. (R. at 461–62). Dr. Hospodar further commented that "[Plaintiff's] grand mal seizure[s] can occur at any time." (R. at 462).

### D.    Administrative Hearing

A hearing regarding Plaintiff's claims was held before ALJ Michael F. Colligan on December 22, 2011. (R. at 29). Plaintiff testified that she lives alone, approximately five minutes away from her parents. (R. at 36). Her boyfriend spends a lot of time at her house, as well. (*Id.*). With respect to her job at her parents' business, Plaintiff stated that she works occasionally—not daily—at the business. (R. at 37). On the days she does work, she is there for only two hours. (*Id.*). Her tasks include writing a small number of invoices or checks. (*Id.*). Plaintiff's mother testified that this is a specially tailored job to help her daughter. (R. at 59). Plaintiff confirmed that her parents make special accommodations for her at work, and if she does not feel well, her mother takes her home. (R. at 37, 49).

Regarding her physical impairments, Plaintiff stated that she has had seizures since the time she was thirteen (13) years old, and that she is under the care of Dr. Hospodar. (R. at 38). She claims that she often forgets to take her medication because of memory problems, but does have a pill box. (R. at 38, 55). The last seizure Plaintiff recalled was a grand mal seizure on October 31, 2011, at which time she wrecked her car. (R. at 39). Plaintiff reported that at the time of the hearing on December 22, 2011, she had not been back to work since her car accident.

(R. at 39). After the accident, Plaintiff's driver's license was revoked on November 15, 2011. (R. at 48). Plaintiff also testified that it was revoked another time in the "2000s," but she was unsure of the time frame. (*Id*.).

At the time of the hearing, Plaintiff reported that she was having grand mal seizures on average of once a month. (R. at 50). Plaintiff testified that when she has a grand mal seizure, she is a danger to herself and others, and often urinates on herself. (R. at 51). Plaintiff's mother stated that when Plaintiff has a seizure, she will scream, fall on the floor, have convulsions, and bite her tongue, which causes it to bleed. (R. at 59). After a grand mal seizure, it usually takes Plaintiff an hour or so to fully regain consciousness. (R. at 52). Plaintiff stated that she feels exhausted afterwards and usually sleeps between twelve and twenty-four hours. (R. at 52–53). Since Plaintiff's seizures appeared to be correlated with her menstruating, she hoped that a hysterectomy would help alleviate her seizures. (R. at 43). However, a hysterectomy did not reduce the frequency of her seizures. (*Id*.). Plaintiff claimed that she cannot have any stress, otherwise she will have seizures. (*Id*.). In addition to grand mal seizures, Plaintiff reported having "baby seizures" where she "blank[s] out" for a few seconds but does not lose consciousness. (R. at 40–41). Regarding the frequency of the baby seizures, Plaintiff said she can go anywhere from a couple weeks without one, to having several in one day. (R. at 42). The longest Plaintiff can remember going without a grand mal seizure is six months. (*Id*.).

Plaintiff stated that she abused alcohol and drugs in the past, but it had been at least three years since she drank alcohol and two or more years since she used illegal drugs.[9] (R. at 44). As far as Plaintiff's diagnosis with Hepatitis C, she claimed that she cannot get treatment for it

---

[9] The court notes that Plaintiff tested positive for opiates when she was taken to the hospital in October 2010 (R. at 464–65).

because she doesn't have a driver's license now and the doctors haven't referred her for any additional treatment at this time.[10] (R. at 45–46). Plaintiff testified that she experiences discomfort using her right arm for basic tasks, and has trouble reaching and elevating her right arm more than half way to should level. (R. at 46–47). Plaintiff claimed that her right shoulder problems are a result of falling when she has a seizure. (R. at 51). As far as mental health evaluations, Plaintiff had never seen a psychologist or psychiatrist independently other than who she was sent to for Social Security. (R. at 47).

Next, the ALJ examined the VE. (R. at 66–68). The VE testified that, based on his review of Plaintiff's record and her testimony at the hearing, Plaintiff's work history includes secretarial work, which is considered semiskilled and sedentary. (R. at 66). The ALJ asked the VE about a hypothetical individual with Plaintiff's age, education, and work experience, could work only at a sedentary exertional level, could not reach above shoulder level with her right arm or hand, which is her dominant hand, would need the usual precautions for someone with seizure disorder, was limited to a low-stress environment, involving no more than simple, routine, repetitive tasks, and could have only minimal contact with the public. (*Id.*). The VE testified that this individual would be able to perform jobs that are available in the national economy, including: an assembler (78,000 jobs in the national economy), a sorter/grader (35,000 jobs in the national economy), and a packer (45,000 jobs in the national economy).(R. at 66–67).

The ALJ then posed a second hypothetical, incorporating the same limitations as the prior question, but adding that the individual has about four grand mal seizures per year, with a four-hour recovery period following such seizures, as well as at least one petite mal seizure per week.

---

[10] Dr. Austin recommended treatment for Plaintiff's Hepatitis C in 2009, and Plaintiff refused same. (R. at 352).

(R. at 67). The VE testified that some jobs would exist, but that if this hypothetical person were to have a grand mal seizure at work, in his experience that person would be terminated. (R. at 68). He further explained that would not be necessarily because the person could not perform the work, but more because of workman's compensation issues or fear of a lawsuit. (*Id.*). He stated that the hypothetical individual's petite mal seizures would not interfere with work, provided that the individual does not work around machinery or heights. (R. at 69).

Plaintiff's attorney then asked the VE about a hypothetical individual who experienced grand mal seizures approximately once per month, at random intervals, with petite mal seizures occurring at random, has Hepatitis C, has poor to no ability to use judgment, deal with work stresses, function independently, maintain attention and concentration, relate predictably in social situations, and demonstrate reliability. (R. at 69–70). The VE testified that there would be no jobs in the national economy for a person with these limitations. (R. at 70–71).

## IV.    STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005); *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[11] 1383(c)(3);[12] *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to

---

[11] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[12] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans*, 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Id.* at 292 (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Newell*, 347 F.3d at 545 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). The court will not affirm a determination by substituting what it considers a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's fact finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d Cir. 1986)).

## V.    DISCUSSION

In his February 22, 2012 decision, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since October 24, 2007, the amended alleged onset date. (R. at 15). At Step Two, Plaintiff's right shoulder impairment and seizure disorder were found to be serious impairments. (*Id.*). Plaintiff's Hepatitis C was not considered a serious impairment because liver testing only revealed mild liver disease, and Plaintiff has refused treatment for same. (R. at 16). Although Plaintiff reported memory problems, no organic mental impairment was established because no acceptable medical source diagnosed Plaintiff with a mental disorder. (*Id.*). At Step Three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

After considering the entire record, the ALJ found at Step Four that Plaintiff has the residual functional capacity as follows:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she cannot reach above shoulder level with her dominant right arm or hand. She must avoid heights and hazardous machinery. The claimant must work in a low stress environment, performing simple, repetitive tasks with minimal contact with the public.

(*Id.*). Given the Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that the claimant can perform. (R. at 23). The ALJ determined that the vocational expert's testimony was consistent with the information in the Dictionary of Occupational Titles, and concluded that Plaintiff is capable of "making a successful adjustment to other work that exists in significant

numbers in the national economy." (R. at 24). Therefore, Plaintiff was not found to be disabled, as defined in the Act. (*Id*.).

On appeal, Plaintiff offers several arguments in objection to the ALJ's decision. (Docket No. 13). Plaintiff argues that the ALJ: (1) erred in giving less weight to the opinions of Dr. Hospodar, and Dr. Newman than Dr. Heil and Dr. Sekas of the state agency, (2) erred by not fully and fairly developing the record, (3) failed to send the Plaintiff out for psychological testing, (4) failed to rule on motions (5) failed to review the Psychiatric Review Technique Form, and (6) failed to ask a hypothetical question that is reflective of all the Plaintiff's impairments. (Docket No. 13 at 10). Defendant argues that the ALJ's decision should be upheld because it is supported by substantial evidence. (Docket No. 17).

Having fully considered the parties' positions and the entire administrative record, the Court agrees with Plaintiff that the ALJ's decision is flawed, such that a remand is warranted for further proceedings under sentence four of § 405(g). *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Specifically, the Court finds that the ALJ improperly discounted the opinions of Dr. Hospodar, Plaintiff's treating physician, given the evidence of record. As such, the Court holds that the ALJ's denial of DIB and SSI benefits is not supported by substantial evidence. *See Burns*, 312 F. 3d at 118.

In reaching this conclusion, the Court finds that the ALJ improperly accorded little weight to the opinions of Dr. Hospodar, Plaintiff's treating neurologist. The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196

(3d Cir. 2011); 20 C.F.R. § 416.927(c)(2). In weighing relevant medical evidence, the ALJ may choose which opinions to accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may be rejected outright only on the ground of contradictory medical evidence. *Id.*

The ALJ accorded little weight to Dr. Hospodar's opinions because he found them to be contradicted by his narratives to Dr. Austin. (R. at 22). To this end, the ALJ pointed out that Dr. Hospodar's records describe "long periods when the claimant is seizure free and then recording seizures only at night or on awakening, which would not result in the claimant having a seizure at work." (*Id.*). By contrast, the ALJ found that the opinions of Dr. Heil and Dr. Sekas—both of whom were referred by the state agency—deserved considerable weight because "those physicians had the benefit of reviewing all objective evidence as well as having been trained to make disability determinations for the Administration." (*Id.*).

In this Court's estimation, the ALJ failed to adequately account for the evidence indicating that Plaintiff began to suffer more frequent seizures around October 2010. (R. at 456, 464–65). The ALJ correctly described Dr. Hospodar's records from 2007 up until October 2010 as describing Plaintiff's seizure condition to be generally well controlled, and that her grand mal seizures were infrequent and occurred only at night. (R. at 539, 541, 340, 355, 357, 368). However, the subsequent records show that Plaintiff was hospitalized in October 2010 and October 2011 for seizures that occurred during the daytime. (R. at 464–65, 504–06). During her appointments with Dr. Hospodar, he also reported that Plaintiff's grand mal seizures were occurring more frequently, although the precise frequency was uncertain given that Plaintiff was not always hospitalized for such seizures. (R. at 464–65, 454, 451, 560–61). In sum, the evidence

of record indicates that Plaintiff's seizure condition changed beginning on or around October 2010. (*Id.*).

Dr. Hospodar opined in October 2011 that Plaintiff was disabled because, in part, her grand mal seizures occurred approximately once per month. (R. at 460). He similarly assessed that Plaintiff had serious functional limitations that would interfere with her ability to maintain a job. (R. at 461–63). The ALJ improperly discredited these opinions because he found them to be inconsistent with Dr. Hospodar's office records prior to October 2010. (R. at 22). This error is further highlighted by the ALJ's decision to accord greater weight to the opinions of Dr. Sekas and Dr. Heil, who made their assessments of Plaintiff's functional capacity in June and July of 2010, respectively, prior to the exacerbation in Plaintiff's seizure disorder. (*Id.*). As a general rule, "Social Security Regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). An updated report is required, however, if the ALJ determines that new medical evidence may change the findings of the consultative examiner. *Id.* Given the evidence that Plaintiff's seizure disorder changed significantly after the assessments of Dr. Sekas and Dr. Heil were conducted, the ALJ should not have relied on their opinions while discrediting Dr. Hospodar. *See Smith v. Astrue*, 961 F. Supp. 2d 620, 644 (D. Del. 2013) ("[W]hen a state agency physician renders an RFC assessment prior to a hearing, the ALJ may rely on the RFC if it is supported by the record as a whole, including evidence that accrued after the assessment.").

Given that a remand is warranted on this basis alone, the Court declines to exhaustively address the other arguments raised by Plaintiff. Instead, the Court will remand the matter to the Commissioner with specific instructions to reopen and fully develop the record as to Plaintiff's claims for DIB and SSI benefits. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir.

2010); *see also Raisley v. Astrue*, Civ. A. No. 12-606, 2013 WL 440971, at *25 (W.D. Pa. Feb. 5, 2013) (citing same).

## VI. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment [12] is GRANTED, IN PART, and DENIED, IN PART, and Defendant's Motion for Summary Judgment [16] is DENIED. The decision of the ALJ is VACATED, and this matter is REMANDED for further consideration, consistent with this Memorandum Opinion. Appropriate Orders follow.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: May 2, 2014
cc/ecf: All counsel of record.